SHELDON, J.
 

 This action was instituted by the state banking commissioner Ralph M. Shulansky (commissioner), to enforce certain subpoenas duces tecum that he had issued to the defendants, Rene Rodriguez and PVT Realty, Inc. (PVT), through his authorized agent, the director of the securities and business investments division of the state department of banking, on March 24, 1994. The subpoenas were issued in the course of an administrative investigation by the securities and business investments division into the marketing by the respondents of limited partnership interests in the Park View Towers Limited Partnership (partnership).
 

 The department began its investigation in the late summer or early fall of 1993, after the Hartford Advocate published an article raising questions about the ongoing business relationship between Rodriguez and his former employer, Mark Shapiro, a bankrupt West Hartford real estate developer. The article, entitled “Hiding in the Shadows,” reported that shortly after Shapiro declared bankruptcy in 1990, Rodriguez, the former chief property officer and “right-hand man” in each of Shapiro’s failed businesses, stalled up several new real estate companies of his own. With Shapiro ostensibly acting as his consultant, Rodriguez reportedly modeled each of his new companies, including the partnership here at issue, after Shapiro’s failed businesses. Each company was set up as a real estate limited partnership the sole asset of which was a residential apartment building that was purchased with a large bank loan and money raised from the sale of limited partnership interests. The central thesis of the article was that in each of these new companies, the apparent reversal of roles between Rodriguez and Shapiro was merely a convenient illusion that permitted Shapiro, with Rodriguez acting as his front man, to maintain his active, even
 
 *76
 
 controlling interest in a potentially lucrative real estate business without having to face his many creditors.
 

 Upon examining the banking department’s own records concerning the partnership, the department examiners learned that the partnership had filed a notice of exemption, whereby it claimed that its private placement on the market was exempt from registration under General Statutes § 36-490 (b) (9) and § 36-500-22 (b) (9) of the Regulations of Connecticut State Agencies. Because of the exempt nature of this filing, the commissioner was required to search outside of department records for further information concerning both the filing itself and the partnership.
 

 From the partnership’s notice of exemption, the examiners learned that PVT would be the partnership’s general partner, that Rodriguez was the president of PVT, and that information concerning the partnership was currently maintained in the Westport office of Charles LeMieux, the PVT vice president and secretary. On request, LeMieux provided the examiners with the offering summary for the partnership, which PVT had prepared for and distributed to potential investors.
 

 The offering summary gave potential investors the following significant information concerning the partnership. The partnership had been formed for the purpose of acquiring a residential rental property located at 967 Asylum Street in Hartford. The purchase price of the subject property would be $2,027,000. Of that total, $304,000 would be raised by the sale of limited partnership interests and the remaining $1,723,000 would be financed by a loan from the Connecticut National Bank (CNB). The offering summary further stated that the subject property would be used as collateral for the CNB loan and that “50% of the loan will be guaranteed by Rene Rodriguez.”
 

 
 *77
 
 Focusing initially on the representation in the offering summary that Rodriguez would guarantee 50 percent of the partnership’s sizeable loan from CNB, the department examiners sought to learn whether, on the date he made the guarantee, Rodriguez had sufficient personal financial resources to honor the guarantee if it were exercised. To that end, they first attempted to obtain the relevant documentation from PVT, through its vice president and secretary, LeMieux. LeMieux, however, did not have all of PVT’s information and materials concerning the partnership, so he redirected the examiners’ inquiry to Rodriguez.
 

 Initially, Rodriguez cooperated with the examiners by providing them with a document entitled “personal financial statement,” which he informed them he had prepared at the request of CNB to demonstrate that he could make good on his guarantee of 50 percent of its loan to the partnership. Later, however, when the examiners asked him to give them additional documentation to verify the assets and liabilities he had listed on his personal financial statement, he demurred, insisting through his attorney that he would only produce the requested documents if it were agreed in advance that they would neither be copied nor be used against either him or PVT.
 

 In the face of such resistance to their investigative efforts, the examiners independently researched the real property listed on schedule C of Rodriguez’ personal financial statement of October 20, 1992. On determining that only one such property had ever been owned by Rodriguez, they decided to issue the subpoenas duces tecum that are the subject of this action.
 

 The subpoena issued to Rodriguez commands him to produce a wide range of documents and records concerning the state of his personal finances on October 20, 1992, the date on which he completed his personal
 
 *78
 
 financial statement for CNB. The subpoena to PVT commands it to produce identical information from its own files and records concerning the state of Rodriguez’ personal finances on the date he prepared his personal financial statement.
 

 Since this action was filed, however, PVT has informed the commissioner that it has no documents or materials in its files or records concerning the personal finances of Rodriguez. For that reason, the commissioner has abandoned his subpoena to PVT and now pursues only his subpoena to Rodriguez.
 

 I
 

 The commissioner’s authority to investigate possible violations of the Connecticut Uniform Securities Act (CUSA), which is codified in chapter 662
 
 [1]
 
 of the General Statutes as §§ 36-470 through 36-502, arises under General Statutes § 36-495. Section 36-495 provides in relevant part: “(a) The commissioner, in his discretion, may, subject to the provisions of chapter 3: (1) Make such public or private investigations within or outside of this state as he deems necessary to determine whether any person has violated . . . any provision of this chapter or any regulation or order hereunder, or to aid in the enforcement of this chapter or in the prescribing of rules and forms hereunder . . . .”
 

 In aid of the broad investigative authority thereby conferred upon him, § 36-495 empowers the commissioner, more particularly, both to issue his own investigative subpoenas and to enforce compliance with those subpoenas by seeking appropriate orders from this court. The statute grants him these powers in the following terms: “(b) For the purpose of any investigation or proceeding under this chapter, the commissioner or
 
 *79
 
 any officer designated by him may . . . subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, agreements, or other documents or records which the commissioner deems relevant or material to the inquiry ....
 

 “(c) In case of . . . refusal to obey a subpoena issued to any person, the superior court for the judicial district of Hartford-New Britain, upon application by the commissioner, may issue to the person an order requiring him to appear before the commissioner, or the officer designated by him there to produce documentary evidence if so ordered or to give evidence concerning the matter under investigation or in question . . . .”
 

 To prevail on any application for an order requiring compliance with an investigative subpoena issued under the authority of § 36-495, the commissioner must prove that the subpoena satisfies the following three part test: first, that it was issued in the course of an investigation that he is legally authorized to conduct; second, that it seeks the production of documents, records and/or materials that are relevant to that investigation; and third, that it is specific and otherwise not unduly burdensome. See
 
 Shulansky
 
 v.
 
 Cambridge-Newport Financial Services Corp.,
 
 42 Conn. Sup. 439, 443, 623 A.2d 1078 (1992). If the commissioner can make this showing, then the subpoenaed party must comply unless that party can prove by “independent evidence that the purpose behind the issuance of the [subpoena] was improper, i.e., that the [subpoena was] issued in order to harass or punish, rather than to gain information relevant to the investigation.” Id., 444-45.
 

 II
 

 In the present case the subpoenaed party, Rodriguez, complains that there are several reasons why the challenged subpoena was not lawfully issued. First, he contends that regardless of whether the subpoena satisfies
 
 *80
 
 the foregoing test, it was issued for the improper purpose of investigating Shapiro, against whom the department of banking has long held a grudge because of its inability to prosecute him criminally, not to investigate possible CUSA violations by the defendants. Second, he claims that even if the subpoena cannot be shown to have been issued for an improper purpose, the extensive records and documents it seeks concerning the Rodriguez’ personal financial affairs are both irrelevant to any possible CUSA violation and unduly burdensome for him to assemble and produce.
 

 The commissioner responds, and this court agrees, that the challenged subpoena meets all three prongs of the above-described three part test and that Rodriguez has failed to prove that it was issued for an improper purpose. On that basis, the court concludes that it must grant the commissioner’s application by ordering that Rodriguez comply immediately with the challenged subpoena.
 

 Ill
 

 To begin, the court is persuaded that the true purpose of the present investigation is neither to investigate Shapiro nor to harass his business associates, but to determine, quite legitimately, whether or not the defendants violated CUSA by the way in which they marketed limited partnership interests in the partner-, ship. That the commissioner was acting with that purpose when he issued the challenged subpoena is supported both by the testimony of securities and business investments division chief examiner Sidney Igdalsky, who credibly so stated at the hearing on this application, and by the documented course of the commissioner’s investigation to date.
 

 It is true, of course, that the commissioner’s initial interest in Rodriguez’ new real estate development companies was initially aroused by the Hartford Advocate
 
 *81
 
 article concerning Rodriguez’ business relationship with Shapiro. His legitimate concern from the outset, however, was that Rodriguez’ new companies might involve the same high risks for investors as had Shapiro’s failed companies, and if so, that investors might have invested in those companies without being fairly apprised of those risks. Thus, the commissioner decided to begin this investigation to ensure that the public had not been misled by the manner in which limited partnership interests in Rodriguez’ new companies had been marketed and sold.
 

 Such an investigation is well within the commissioner’s legal authority because it is clearly designed to uncover possible violations of CUSA. One of CUSA’s most important provisions is its express prohibition of conduct that tends directly or indirectly to mislead or defraud potential investors as to the nature of their investments in securities or the risks associated therewith. This prohibition is stated as follows in General Statutes § 36-472 (transferred to General Statutes § 36b-4 in 1995):
 
 “No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly:
 
 (1) Employ any device, scheme or artifice to defraud; (2)
 
 make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,
 
 or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.” (Emphasis added.)
 

 To determine whether or not the emphasized portion of § 36-472 has been violated in the marketing of a given security, the commissioner must first identify all statements that have been made to potential investors “in connection with the offer, sale or purchase of [that] security,” then establish the context in which those statements were communicated in order to assess their
 
 *82
 
 probable impact on the investing public. With that goal in mind, the commissioner first obtained and examined the offering summary that the respondents had prepared and used to market the partnership.
 

 Next, the commissioner sought to determine whether or not the statements made in the offering summary were true, and if so, whether they were accompanied by all material facts that were necessary to make them not misleading in light of the circumstances under which they were made. Focusing particularly on the defendants’ representation that Rodriguez would guarantee 50 percent of the partnership’s $1,723 million loan from CNB, the commissioner sought to learn whether Rodriguez was financially capable of honoring his guarantee in the event it were exercised.
 

 Rodriguez objects that he should not be made to produce information concerning his ability to honor his guarantee of the partnership’s loan from CNB because potential partnership investors were never told that he could honor that guarantee, and would not, in any event, have considered such a representation material to their decision whether or not to invest in the partnership. All the investors were told, he argues, was that he had indeed made and CNB had indeed accepted his guarantee of 50 percent of its loan to the partnership. Only CNB, not potential investors, had been given his personal financial statement to substantiate his ability to honor the guarantee. He further contends that even if potential investors had been so informed, a misrepresentation on that score could not have affected their investment decisions because each, as a sophisticated investor, would have realized: (1) that notwithstanding the availability of the guarantee, the bank could choose to seek recovery of its loan by foreclosing on the collateral in the event of a default; and (2) that even if the bank initially pursued the guarantor, the guarantor had a right to seek reimbursement from the borrower for
 
 *83
 
 any amounts advanced by him to satisfy the partnership’s debt, and could do so by himself foreclosing on the collateral. Therefore, he concludes, because the investor’s investment in the partnership would be no less at risk if the partnership’s loan were guaranteed than if it were not guaranteed, any failure to inform investors in the offering summary that the guarantor could not honor his guarantee of the partnership’s loan cannot possibly be found to have been an “omi[ssion of] ... a
 
 material
 
 fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .” (Emphasis added.) General Statutes § 36-472 (2).
 

 The commissioner responds, and this court agrees, that the omission of such information from the offering statement might indeed have constituted a violation of § 36-472 (2) because without it, the offering statement might have misled potential investors to believe that the guarantor could make good on his guarantee, and thereby convince them, to their detriment, that the partnership was a better, safer investment than might really have been the case. This is so for the following reasons.
 

 First, investors understand that the soundness of an investment depends upon the ability of the business invested in to make a profit or otherwise increase the value of its assets. This, in turn, depends upon the ability of the business to generate sufficient income to exceed its current expenses, including debt service, so that the excess can either be reinvested in the business or be repaid to the investors as income.
 

 When a bank makes a loan to a business, and secures its loan with real property as collateral, it typically has a great interest in ensuring that the business will pay off the loan in accordance with the loan agreement, making regular, periodic payments from its current income, rather than forcing the bank to foreclose on
 
 *84
 
 the collateral in the event of a default. In an active market, when real estate values are increasing, the prospect of foreclosure is not particularly troubling, for then there is little likelihood that the eventual sale of the property will not repay the borrower’s debt in full. When, however, the market is not strong, the prospect of foreclosing on a property the value of which may have sunk far below the unpaid balance of the loan is most unwelcome. To protect against this eventuality, lending institutions frequently seek guarantees for all or part of their loans.
 

 By obtaining a third party’s guarantee for its loan, the lender gains two benefits. First, it assures itself that in the event of the borrower’s default, it will have immediate recourse not only against the borrower’s potentially devalued collateral, but against the funds of a solvent guarantor. Second, it assures itself that the guarantor himself is sufficiently confident in the likely profitability of the borrower’s business that he is willing to risk his own funds on the ultimate success of that business. Plainly, neither of these benefits can be realized if the guarantor is incapable of honoring this guarantee.
 

 When the seller of a limited partnership represents to potential investors that a third party has guaranteed 50 percent of a large bank loan with which the partnership has purchased its only asset, the seller therefore informs them, by necessary implication, of the following additional facts: first, that the guarantor can indeed make good on his guarantee in the event it is exercised; second, that by risking his own money on the likely success of the partnership’s investment, the guarantor has confidence in the soundness of the partnership as an investment; and third, that by making the loan in question on the strength of the guarantor’s guarantee, the bank itself has confidence both in the guarantor’s business judgment and in the availability of his funds
 
 *85
 
 to back that judgment in the event of a default. On the strength of such representations, a potential investor might well be tempted to invest in the partnership when he would not consider doing so in the absence of the guarantee.
 

 By the same token, a potential investor’s awareness that the guarantor of a partnership loan cannot make good on his guarantee would give him strong reason not to invest in the partnership. To begin with, such knowledge might legitimately cause him to question the reliability of the partnership’s other representations, both to him, as a potential investor, and to the bank. If the partnership’s representations cannot be trusted, then the prudent investor will obviously not rely upon them.
 

 Second, such information would obviously demonstrate that the guarantor took no personal risk upon himself when he made his guarantee.
 

 Third, if it were shown that the bank acted in reliance on the guarantee even though it was worthless, the investor might fairly conclude either that the bank had failed to conduct an adequate investigation as to the profitability of the partnership’s business or that it had been lied to by the guarantor during the loan application process. In either case, such knowledge would cause the investor to lose confidence in the partnership as an investment opportunity, for it would inform him that no reliance could be placed on the bank’s own judgment that its loan was prudently made.
 

 Against this background, the court concludes that the documents, records and materials that the commissioner has subpoenaed are all clearly relevant to the legitimate investigation concerning possible violations of CUSA in the marketing of the partnership here at
 
 *86
 
 issue. By shedding useful light on the ability of Rodriguez to honor his guarantee, they will enable the commissioner to determine whether or not the offering statement was misleading to potential investors, and thus a violation of § 36-472 (2).
 

 IV
 

 The court finally concludes that the subpoena issued to Rodriguez is both specific and not unduly burdensome, for it focuses uniquely on the state of Rodriguez’ personal finances when, on October 20, 1992, he completed his personal financial statement for the benefit of CNB. If that statement was honestly prepared, then surely its preparation was based on a review of the very same documents, records and materials that the commissioner now seeks to examine.
 

 Therefore, the process of reassembling and producing these documents and materials should only be marginally more burdensome now than it was or should have been when Rodriguez first did or should have done it two years ago. Because those documents contain information that is relevant to whether or not potential partnership investors were misled by the defendants in 1992, Rodriguez must now produce them for the commissioner’s immediate inspection.
 

 For all of the foregoing reasons, the court hereby grants the commissioner’s application, and thereby orders that Rodriguez comply with the commissioner’s subpoena dated March 24, 1994, not later than twenty days from the issuance of this decision.
 

 [1]
 

 In 1995, chapter 662 of the General Statutes was transferred to chapter 672a, General Statutes §§ 36b-2 through 36b-33.